UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

BRIAN CHANDLER,                          )
                                         )
                    PLAINTIFF,           )
                                         )
        VS.                              )        CAUSE NO. 2:12-CV-175-RLM
                                         )
JOHN BUNCICH, INDIVIDUALLY AND IN        )
HIS OFFICIAL CAPACITY AS SHERIFF OF      )
LAKE COUNTY AND/OR PERSON SERVING        )
IN THAT CAPACITY IN 2011, LAKE           )
COUNTY SHERIFF'S                         )
DEPARTMENT, LAKE COUNTY                  )
JAIL, LAKE COUNTY WORK                   )
RELEASE, SERGEANT OAKLEY,                )
INDIVIDUALLY AND AS LAKE COUNTY          )
WORK RELEASE DIRECTOR,                   )
                                         )
                    DEFENDANTS.          )

OPINION and ORDER

This matter is before the court on motions for summary judgment filed by defendants John Buncich, Lake County Sheriff's Department, and Lake County Jail and defendants Lake County Work Release and Sergeant Oakley. The defendants argue no evidence exists to support plaintiff Brian Chandler's claims and they are immune from liability on several of the claims. Mr. Chandler opposes the motions. Argument was heard on October 20, 2014.

I. BACKGROUND

Mr. Chandler was serving 30 consecutive weekends in the Lake County Work Release program for a Class D felony of theft when he alleges that he was

subject to sexual abuse by a male correctional officer, Julian "Julio" Koleff, during strip searches. Mr. Chandler claims the inappropriate strip searches, that were done alone and involved touching, took place on two to four occasions. After the second or third instance, he reported the abuse to the Indiana State Police on April 14, 2011 (all pertinent dates are 2011). According to Work Release Director John Oakley's notes, Indiana State Police Sergeant Mike Bailey found no grounds for a sexual assault charge but notified Director Oakley, on April 17, that Mr. Chandler had reported sexual abuse by Officer Koleff, that he told Mr. Chandler to tell Work Release staff about the incident, and that Mr. Chandler feared retaliation. Director Oakley's notes reflect that he then informed Corrections Administrator Jeff Kumorek about the communication from the Indiana State Police.

The next weekend, Mr. Chandler reported to the Work Release on April 22. The facility's entrance and exit log shows that he was booked by Officer Key and searched by Officer Koleff. Mr. Chandler's deposition testimony doesn't clearly reflect whether sexual abuse occurred on the 22nd. During his shift at the Work Release on Saturday, April 23, another officer told Corporal Christopher McQuillin that Mr. Chandler and another weekend inmate, Nate Creviston, were complaining about strip searches performed by Officer Koleff. According to Cpl. McQuillin's statement, he told Mr. Chandler he would talk to him when he finished what he needed to get done.

In the meantime, Officer Koleff, who had learned of the accusations, confronted Mr. Chandler. When Cpl. McQuillin learned of this, he prohibited Officer Koleff from having any contact with the weekend inmates, and then met with Mr. Chandler and Jonathan Doyle, another weekend inmate. According to Cpl. McQuillin's statement, Mr. Chandler reported that on at least one occasion Officer Koleff touched his penis during a strip search, and Mr. Doyle reported that Officer Koleff turned off the lights in the locker room and the officer's face was about a foot away like he was going to kiss him. Cpl. McQuillin says he told the inmates that he would pass along the information to the proper people. He prohibited Officer Koleff from having any contact with the weekend inmates, stated that the officer was to have another officer with him at all times, and gave him a verbal reprimand, stating that two officers must be present for a strip search. Cpl. McQuillin reports that Officer Koleff didn't deny strip searching the inmates but denied that any touching occurred.

The record contains conflicting evidence about what happened next. According to Cpl. McQuillin, he notified his supervisor, Sergeant George Brugos, about the day's events, Sgt. Brugos told him to notify Director Oakley, and "That's when I found out that everybody knew about it already because the State Police had made contact with him previously." Sgt. Brugos confirmed that Cpl. McQuillin notified him of the report on Saturday, said he didn't speak with anyone at the facility about the accusation on Sunday, but when Cpl. McQuillin told him on Monday that he hadn't written up a report or talked to

the Director about the accusations, Sgt. Brugos suggested that he speak with the Director. According to Director Oakley's notes, Cpl. McQuillin had been advised by Sgt. Brugos to notify the Director when he returned to the office on Monday. Regardless, on Monday, April 25, Director Oakley's notes reflect that Cpl. McQuillin notified him about Mr. Chandler's accusations, and Mr. Chandler contacted him directly and told him that Officer Koleff strip searched him and touched and pulled his penis.

On Tuesday, Mr. Chandler and Mr. Doyle met with Director Oakley and Lieutenant Sarkey. Mr. Chandler repeated his accusation and Mr. Doyle reported the incident in which Officer Koleff turned off the lights in the locker room. At that meeting, both men gave Director Oakley papers they allege Officer Koleff had written his phone number on and given to them. Mr. Chandler claimed he would send Director Oakley a copy of his phone records showing that Officer Koleff called him. For the internal investigation into the matter, Sgt. Brugos and Lt. Sarkey gave statements the next day, April 27, and Cpl. McQuillin gave his statement on April 28. Detective Michelle Weaver's notes on the "Internal Investigation Involving Koleff/Chandler/Doyle" state that she and Detective Jeff Minchuk interviewed Officer Koleff about the accusations on Friday April 29. The detectives asked Officer Koleff to take a voice stress analysis test regarding the allegations, and he agreed to do so. Mr. Chandler also gave a statement to the detectives on April 29. The entrance and

exit log shows that when Mr. Chandler entered the facility that day, Cpl. McQuillin booked him and Officer Key searched him.

The following week, on May 2, Officer Koleff spoke with Detective Weaver and refused to take the voice stress analysis test. Later that day, Mr. Chandler and Mr. Doyle took voice stress analysis tests regarding the accusations. During Mr. Chandler's entrance to the Work Release facility on May 6, the log says he was booked by Officer Hill and searched by Cpl. McQuillin.

Mr. Chandler learned from an inmate that because he reported Officer Koleff, a favorable guard to the inmates, a "hit" had been ordered on him. In his deposition testimony, Mr. Chandler says he notified the detectives about the hit at some point during the week before it happened and he was assured of his safety. Mr. Chandler can't confirm or deny whether he told Director Oakley about the hit before it happened. On Saturday May 7, Mr. Chandler was attacked by an inmate in a communal bathroom at the Work Release facility. According to the "Lake County Sheriff's Department Work Release Unit Incident Report" regarding the attack, an officer observed a commotion at 8:50 p.m. and found Mr. Chandler in his room with blood on his lower face and uniform top. The officer says Mr. Chandler wouldn't tell him the name of the person who assaulted him and didn't want to press charges either before or after his trip to the hospital. Upon his return from the hospital, Mr. Chandler told officers the attack took place in the east bathroom. The report notes that Mr. Chandler

didn't approach the security office immediately after the assault and didn't tell staff what happened or who assaulted him.

Mr. Chandler suffered lacerations on his face, fractured facial bones, and broken teeth. He claims the Work Release staff delayed his medical treatment by two hours and transferred him to the hospital by van instead of contacting emergency medical personnel. Mr. Chandler says he paid for the medical expenses himself. The Work Release Report outlines the following timeline: the attack occurred at 8:50 p.m.; Mr. Chandler was transported to Methodist Hospital at 9:15 p.m.; he returned to the facility at 11:55 p.m.; he was issued a new uniform and linens at 12:00 a.m.; he was taken to Walgreens to fill his prescriptions; and he returned to the facility at 12:50 a.m.

Mr. Chandler says the inmate who attacked him was roaming the facility freely the morning after the assault. On Monday, May 9, Lake County Police Detective James Weller was assigned to investigate the assault. According to Detective Weller's report, Mr. Chandler told Detective Weller that he didn't know the name of the inmate who attacked him, but he could visually identify the person. In the meantime, at the request of the Corrections Administrator, a judge temporarily suspended Mr. Chandler's sentence. Sheriff John Buncich terminated Officer Koleff's employment on May 27 for "conduct unbecoming of an employee of the Department, failure to treat an inmate civilly and courteously, and failure to fully cooperate with an investigation." The four

inmates involved in the physical attack were later charged and convicted for participation in the assault.

Mr. Chandler brought suit against the Lake County Sheriff's Department, Lake County Jail, and Lake County Work Release and Sheriff Buncich and Sergeant Oakley in both their official and individual capacities. He alleges the defendants are liable pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights and under state law for negligence, gross negligence, and intentional infliction of emotional distress. Mr. Chandler also asserts a state law indemnification claim.

The Lake County Sheriff's Department, Lake County Jail, and Sheriff Buncich (the Sheriff defendants) move for summary judgment because no evidence exists to support the claims and they are immune from liability for the state claims. Also, Sheriff Buncich contends that he is immune from individual liability. Lake County Work Release and Sergeant Oakley move for summary judgment and argue the Work Release is a part of the Sheriff's Department and can't be sued individually, for the same reason Director Oakley can't be sued in his official capacity, and Director Oakley is immune from liability on the individual capacity claims. Otherwise, they adopt the arguments of the Sheriff defendants.

## II. PRELIMINARY PROCEDURAL ISSUE

The Sheriff defendants argue that Mr. Chandler's response doesn't comply with Local Rule 56-1(b) or Local Rule 7-1(e). Under Rule 56-1(b)(2), a summary judgment response brief or its appendix must include a section that identifies the material facts the party contends are genuinely disputed. The Sheriff defendants emphasize that Mr. Chandler filed his "Statement of Genuine Disputes" as a separate document. Under Rule 7-1(e), a response brief, excluding appendices, can't exceed 25 pages without leave from the court for extraordinary and compelling reasons. If the court allows a longer brief, the brief must include a table of contents with page references, an issue statement, and a table of authorities. Local Rule 7-1(e)(2). The Sheriff defendants argue that Mr. Chandler's response brief plus the separately filed statement of genuine disputes totaled 41 pages, the court didn't grant Mr. Chandler leave to file the additional pages, and the longer brief didn't include the required additional sections. Finally, the Sheriff defendants argue the response is a narrative legal argument without citations to the record. The mistakes, they argue, should result in summary judgment for the defendants.

Local rules designed to streamline the resolution of summary judgment motions, like Rule 56-1, can be strictly enforced. *See* <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 922 (7th Cir. 1994). Summary judgment can be appropriate when the nonmovant didn't submit a factual statement in the form called for by the local rule. <u>Id.</u> The result of non-compliance is to concede the movant's version of the facts. <u>Id.</u> Mr. Chandler filed the appropriate documents,

but he didn't file the documents appropriately. To cure his error, Mr. Chandler could have simply titled the statement of genuine disputes "Appendix to Response to Motion for Summary Judgment." The substance of the response brief and the statement of genuine disputes comply with the rule. The goal of local rules addressing summary judgment procedure is to direct the court to the factual disputes and the record evidence in an efficient manner. <u>Id.</u> at 923. Mr. Chandler's filing error doesn't frustrate this goal, and the court finds the error harmless. Likewise, the additional pages in the statement of genuine disputes wouldn't be counted against the page limit if filed as an appendix. The response brief itself is 20 pages and within the limits prescribed by the local rule. Finally, although the narrative form of Mr. Chandler's response didn't direct the court to the factual disputes and the record evidence in an efficient manner, the local rules don't require a specific format for the substance of the response brief. The court will take the summary judgment briefs and record as they stand.

## III. Standard of Review

Summary judgment is appropriate if no genuine dispute as to any material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255

(1986). If, based on the evidence of record, a reasonable factfinder could return a verdict for the nonmoving party, a genuine issue of material fact exists and summary judgment must be denied. Kodish v. Oakbrook Terrace Fire Prot. Dist., 604 F.3d 490, 507 (7th Cir. 2010). If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the opposing party is proper. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). In such a case, the moving party can meet its burden by showing there is an absence of evidence to support the nonmoving party's case. Id. at 322. Although it might seem counter-intuitive, a defendant moving for summary judgment has no burden other than to point out the deficiencies of the plaintiff's case, Modrowski v. Pigatto, 712 F.3d 1166, 1168 (7th Cir. 2013); Shields v. Dart, 664 F.3d 178, 182 (7th Cir. 2011). Once the defendant has done so, the plaintiff has the burden to show a genuine material fact dispute. *See* Bass v. Joliet Public Sch. Dist. No. 86, 746 F.3d 835, 841 (7th Cir. 2014). The plaintiff can't meet that burden simply by saying an opposing witness is lying or wrong; he "must produce evidence so showing." Carroll v. Lynch, 698 F.3d 561, 565 (7th Cir. 2012).

The parties dispute the validity of the record evidence. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to the record evidence or showing the record evidence does or doesn't establish the fact. FED. R. CIV. P. 56(c)(1). A valid objection to the evidence is

that it can't be presented in a form that would be admissible. FED. R. CIV. P. 56(c)(2). Under Local Rule 56-1(e), disputes about the admissibility of evidence should be addressed in a separate motion. Regardless, at the summary judgment stage, the evidence need only be of a kind admissible at trial, it doesn't have to be presented in a form that would be admissible at trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 921 n.2 (7th Cir. 1994). Mr. Chandler claims most of the defendants' evidence contains hearsay. The court declines to examine the admissibility of every piece of evidence submitted by the defendants based on this general objection.

Mr. Chandler levels a more specific challenge at Sheriff Buncich's affidavit. He claims the Sheriff's assertions are generic and not based on or supported by other facts in the record. An affidavit supporting a summary judgment motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. FED. R. CIV. P. 56(c)(4). Neither specific statements nor corroborated statements are required. Similarly, the defendants object to the self-serving nature of Mr. Chandler's deposition testimony offered by Mr. Chandler himself as evidence of his claims. But a plaintiff may rely on self-serving admissible evidence to create a material factual dispute. Hill v. Tangherlini, 724 F.3d 965, 967 n.1 (7th Cir. 2013). As long as there is no conflict with an earlier sworn statement by the party, a party's affidavit can create a fact issue even if uncorroborated and "self-serving." *See* United States

-11-

v. Funds in Amount of One Hundred Thousand One Hundred Twenty Dollars, 730 F.3d 711, 718 (7th Cir. 2013); Hill v. Tangherlini, 724 F.3d 965, 967 (7th Cir. 2013) ("Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving. . . . As we have repeatedly emphasized over the past decade, the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). Even credulity-straining evidentiary material must be viewed in the motion's opponent's favor, *see* Miller v. Gonzalez, 761 F.3d 822, 827 (7th Cir. 2014), though on rare occasions, a witness's deposition can contain too many self-contradictions to create a fact issue. *See* Nunez v. BNSF Ry. Co., 730 F.3d 681, 683-684 (7th Cir. 2013).

## IV. 42 U.S.C. § 1983 CLAIMS

The defendants say no evidence exists to support Mr. Chandler's claims and the officials are entitled to qualified immunity on the individual capacity claims. 42 U.S.C. § 1983 imposes liability on a person who acts under the color of law and violates a person's rights secured by the Constitution and laws of the United States. A municipality, which isn't a person, can be liable under § 1983 if the alleged unconstitutional action implements or executes (1) a policy, ordinance, regulation, or decision officially adopted and promulgated by that municipality's officers or (2) a custom with no formal approval. Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-691 (1978). The municipality

thus causes an employee, through a policy or custom, to violate a person's constitutional rights. Id. at 692. The court begins by addressing the defendants' arguments about the proper parties.

A. Lake County Work Release & Director Oakley (Official Capacity)

Lake County Work Release asserts that it is merely an extension of the Lake County Sheriff's Department and so isn't an entity that can be sued. The Work Release relies on an affidavit of Willie Stewart, Jr., the director of the Work Release from January to June 2014, to support this assertion. Mr. Stewart says the program was "not a separate entity, but rather an extension of the Lake County Sheriff's Department." Mr. Chandler contends Mr. Stewart has no knowledge of the entity structure at the time of the incident in 2011 (Director Oakley was the director at that time) and doesn't have the knowledge or expertise to understand the legal relationship between the two entities. Again, affidavits used to support a summary judgment motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. FED. R. CIV. P. 56(c)(4). As a former director of the program at issue, Mr. Stewart has enough personal knowledge and expertise to testify to the relationship between the Work Release and the Sheriff's Department. As a part of the Sheriff's Department, the Work Release isn't a distinct governmental entity or a suable entity. Argandona v. Lake Cnty. Sheriff's Dep't, No. 2:06 CV 259, 2007 WL 518799, at *3 (N.D. Ind. Feb. 13, 2007).

It follows, Director Oakley argues, that he can't be a proper party in his official capacity. Mr. Chandler named Sergeant Oakley in his official capacity as Lake County Work Release Director. An official capacity claim is another way to plead an action against an entity of which the officer is an agent. Kentucky v. Graham, 473 U.S. 159, 165-166 (1985) (quoting Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)). The Work Release isn't a separate entity from the Sheriff's Department, so a claim against Director Oakley in his official capacity in order to reach the Work Release is equally unsuccessful. Judgment for the Lake County Work Release and Director Oakley in his official capacity is appropriate.

## B. Sheriff Buncich (Official Capacity)

The Sheriff defendants argue that Sheriff Buncich in his official capacity and the Lake County Sheriff's Department are redundant defendants. Official capacity suits are treated as a suit against the entity of which the officer is an agent; "the real party in interest is the entity." Kentucky v. Graham, 473 U.S. at 166. So a suit against the Sheriff in his official capacity is a suit against the Sheriff's Department. "There is no longer a need to bring official-capacity actions against local government officials, for under *Monell, supra,* local government units can be sued directly for damages and injunctive or declaratory relief." Kentucky v. Graham, 473 U.S. at 167 n.14. Suit against Sheriff Buncich in his official capacity adds nothing to the suit against the Sheriff's Department, and the defendants are redundant. *See* Robinson v.

Sappington, 351 F.3d 317, 340 (7th Cir. 2003) (claims that sought to impose liability on the same defendant, were based on same facts, and didn't provide any additional resources for settlement or satisfaction were redundant). Judgment for Sheriff Buncich in his official capacity is therefore appropriate. The claims against the Lake County Sheriff's Department[1] and the Lake County Jail[2] endure.

## C. Municipal Liability

A municipality can be liable under § 1983 where the alleged unconstitutional action results from the execution of the municipality's policy or custom. City of Oklahoma City v. Tuttle, 471 U.S. 808, 818 (1985); Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-691 (1978). Mr. Chandler cites Monell and claims that municipal liability attaches to policies and decisions, not just customs, that haven't received formal approval through the government's official decision-making channels. This means, he argues, that even if there is no policy or custom, a decision by an official that wasn't formally adopted can lead to municipal liability. The court reads the law as being a little more complicated. The Monell court first addressed the implementation or execution of "a policy statement, ordinance, regulation, or

---

[1] The Sheriff's Department doesn't argue that it isn't a proper defendant in a § 1983 action. See Snyder v. Smith, 7 F.Supp.3d 842, 868 (S.D. Ind. 2014) but see Argandona v. Lake Cnty. Sheriff's Dep't, No. 2:06 CV 259, 2007 WL 518799, at *5 (N.D. Ind. Feb. 13, 2007).

[2] The Jail doesn't argue that it isn't "person" under § 1983. See Ulery v. Cass Cnty. Jail, No. 3:05-CV-430 RM, 2005 WL 2406044, at *2 (N.D. Ind. Sept. 27, 2005) (quoting Powell v. Cook Cnty. Jail, 814 F.Supp. 757, 758 (N.D.Ill.1993)).

-15-

decision officially adopted and promulgated by that body's officers." <u>Monell v. New York City Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 (1978). The court then continued, "Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." <u>Id.</u> at 690-691. A municipal entity therefore may be liable for a constitutional violation that was the result of a policy or decision that was adopted and promulgated by the entity's officers or a practice that was so permanent and well settled that it constituted a custom with the force of law. <u>Id.</u> at 691.

This returns the analysis to municipal liability for constitutional deprivations that result from the execution of a policy or custom. This can be shown by: "(1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." <u>Walker v. Sheahan</u>, 526 F.3d 973, 977 (7th Cir. 2008). An affirmative link between the policy or custom and the constitutional violation must be shown. <u>Palmer v. Marion Cnty.</u>, 327 F.3d 588, 594 (7th Cir. 2003).

Mr. Chandler asserts generally that his rights were violated under the policies and practices of the Sheriff defendants. His allegations can be grouped into three categories: sexual abuse during inmate searches, inmate-on-inmate violence, and adequate medical treatment. Again, as summary judgment movants, the Sheriff defendants have no greater burden than to point out the deficiencies of Mr. Chandler's claims. <u>Modrowski v. Pigatto</u>, 712 F.3d 1166, 1168 (7th Cir. 2013). If they do so, Mr. Chandler then has the burden to show a genuine material fact dispute, *see* <u>Bass v. Joliet Public Sch. Dist. No. 86</u>, 746 F.3d 835, 841 (7th Cir. 2014), and he can't meet that burden simply by saying the defendants' evidence is wrong. <u>Carroll v. Lynch</u>, 698 F.3d 561, 565 (7th Cir. 2012).

To begin with, the Sheriff defendants argue that Mr. Chandler points to no evidence to support his claims. Sheriff Buncich submitted an affidavit in which he asserts it was the Sheriff Department's policy to adequately train and supervise all officers, including the custody officers assigned to the Work Release, to comply with state and federal law.

Specifically regarding the inmate search policy, the Sheriff defendants submitted statements from three Work Release employees. According to Lt. Sarkey:

> The regular way is a pat down search on the outside of the clothing. You go up and down their legs and their backs, search their clothes…. During a strip search, you have two officers. The inmate stands at one end of the room and the two officers stand at the other end of the room. Anything the inmate does is in front of the officers but they do not touch him.

Cpl. McQuillin reiterated, "We have a policy that, if somebody is going to get strip searched, two officers have to be present for obvious reasons." Sgt. Brugos referred to "normal pat downs" and said during strip searches "we stand back." Mr. Chandler responds that the only policy regarding inmate searches was that inmates would be thoroughly searched upon entry to and exit from the facility. This policy is found in the General Orders section of the "No. 7 Work Release Policies and Procedures" document. He emphasizes that the Sheriff defendants had no written policy on when and how strip searches were appropriate. So, the policy evidence presented shows the defendants had a written policy that inmates were to be searched thoroughly, no written policy on when and how strip searches were appropriate, and a custom that inmates would be patted down on the outside of their clothing and that strip searches would be conducted by two officers and with no touching. Mr. Chandler's testimony that he was strip searched alone and touched, accepted as true as it must be at this stage, offers evidence of an event in which the strip search custom at the facility wasn't followed, but Mr. Chandler offers no evidence of a pattern of this behavior by other guards that would create an alternative custom of strip search procedures. Mr. Chandler doesn't assert the defendants' policy that inmates be searched thoroughly is unconstitutional, and he doesn't assert the defendants' custom of strip searches being conducted by two officers and with no touching is unconstitutional.

The Sheriff defendants contend the "Lake County Personnel Policy Manual" has a written policy prohibiting sexual harassment of "all those who enter the workplace," including inmates. In his affidavit, Sheriff Buncich asserts that all divisions of the Sheriff's Department, including the Work Release, had a zero tolerance policy for sexual harassment. Mr. Chandler claims no documentation supports the Sheriff's assertion of a zero tolerance policy. For the purpose of a summary judgment motion, however, documentation to support the facts asserted in the Sheriff's affidavit isn't required. *See* FED. R. CIV. P. 56(c)(4). Mr. Chandler claims the Sheriff defendants didn't have a written policy on sexual abuse of inmates, but the evidence reflects policies prohibiting sexual harassment. Mr. Chandler doesn't tell the court how the current sexual harassment policies, although lacking sections specifically regarding inmates, are linked to his abuse.

Mr. Chandler claims the Sheriff defendants didn't have a written policy on how inmates or employees were to report sexual abuse. He criticizes the internal investigation into the matter and contends that the abuse continued and the accused officer remained on the job after his report of the abuse. Sheriff Buncich claims in his affidavit that the Sheriff Department's policy was to promptly investigate and discipline any officer for misconduct or for failing to follow department policies. The record evidence reflects that Mr. Chandler first reported the abuse to Sgt. Bailey at the Indiana State Police, who didn't pursue the charge but contacted Director Oakley regarding the allegation. Mr.

Chandler then reported to the Work Release facility and alleges that he was abused again. The next day, Saturday, Cpl. McQuillin learned from an employee that Mr. Chandler had reported that Officer Koleff had sexually abused him during a strip search. After meeting with Mr. Chandler, Cpl. McQuillin prohibited Officer Koleff from having any contact with the weekend inmates, stated that the officer was to have another officer with him at all times, and verbally reprimanded him for conducting a strip search without two officers present. Cpl. McQuillin notified Director Oakley of the situation on Monday, when Director Oakley returned to the office. Mr. Chandler also reported the abuse to him that day. After meeting with Mr. Chandler, Director Oakley began the internal investigation, and the record reflects a thorough investigation by the detectives. The accused officer was eventually terminated.

According to the "No. 7 Work Release Policies and Procedures" document General Orders section:

> Custody/Correctional Officers will be disciplined subject to Lake County Personnel Policy 1077(C). Any disciplinary measure calling for probation, suspension, or termination, will be approved by the Sheriff. Write-ups and recommendations for disciplinary measures shall be forwarded through the appropriate chain of command.

The Code of Ethics section also states:

> Each staff member shall report without reservation any corrupt or unethical behavior which could affect an inmate, staff member, or the integrity of the Lake County Sheriff's Department.
>
> Any staff found in violation of the Sheriff's Work Release Code of Ethics may face possible disciplinary action in accordance to County Personnel Policy 1077(C).

The briefs present factual questions about the Sheriff Department's handling of the investigation – e.g., whether Mr. Chandler was abused after Sgt. Bailey contacted Director Oakley and what day Mr. Chandler reported the abuse to a Work Release employee. Nonetheless, Mr. Chandler doesn't claim that the lack of a written policy on how inmates were to report sexual abuse led him to first report the abuse to the Indiana State Police or caused him difficulty when reporting the abuse to Work Release staff or Director Oakley. The court takes all Mr. Chandler's evidence to be true, including his allegation that the abuse continued after he reported it. The only possible date for the continued abuse was April 22, which was after Mr. Chandler reported the abuse to the Indiana State Police but before he reported it to a Work Release employee or Director Oakley. Mr. Chandler doesn't tell the court how a written reporting policy could have changed the series of events or prevented his injury, so the assumed lack of a written Work Release policy isn't to be related to his alleged injury of continued abuse. Further, Mr. Chandler doesn't allege that Director Oakley's decision not to take further action on the report from the Indiana State Police, instead waiting for Mr. Chandler to report the behavior to him, was the result of a policy or custom.

The Sheriff defendants don't point to specific evidence regarding an inmate-on-inmate violence policy, but simply argue that Mr. Chandler points to no evidence to support his claim the Sheriff defendants didn't have a policy that referenced inmate-on-inmate violence. In his response, Mr. Chandler

contends the Work Release should have a policy that segregates the violent inmates and the regular work release inmates from the weekend inmates. He emphasizes that the inmates who were involved in the attack all had violent histories. But Mr. Chandler doesn't explain how a policy that segregates inmates would have prevented an attack that he also claims was the result of his accusations regarding an officer who was well liked by the other inmates.

Sheriff Buncich is no longer a defendant in this case, but Mr. Chandler repeatedly asserts the Sheriff failed to enact the relevant policies. A lack of a policy can be deliberately indifferent if the Sheriff was aware of a substantial risk of harm, either through the general conditions at the facility or a specific threat to the inmate, but didn't take appropriate steps to devise a policy or devise an adequate policy to protect the inmate from a known danger. Butera v. Cottey, 285 F.3d 601, 605 (7th Cir. 2002). The Sheriff defendants contend there is no evidence that inmate-on-inmate violence (or sexual abuse for that matter) was running rampant at the Work Release in 2011. Mr. Chandler claims inmate-on-inmate violence (and sexual abuse) is a common problem at this type of facility, but he doesn't point to any evidence of inmate-on-inmate violence (or sexual abuse) at the Work Release facility, other than the incident in which he was attacked (and abused). Evidence of one incident, or even multiple prior incidents, isn't enough to put the Sheriff on notice of general conditions at a facility that need to be addressed with a better policy. Butera v. Cottey, 285 F.3d 601, 608 (7th Cir. 2002) (The inmate's "claim fails because he

has offered no evidence that any incident of sexual assault, other than his own, has ever occurred in cellblock 2–I."); Palmer v. Marion Cnty., 327 F.3d 588, 595-596 (7th Cir. 2003); Merriweather v. Marion Cnty. Sheriff, 368 F. Supp. 2d 875, 885 (S.D. Ind. 2005) ("must demonstrate more than the mere prior occurrence of inmate-on-inmate violence as '[s]ome level of brutality and sexual aggression among [prisoners] is inevitable no matter what the guards do.'") (quoting McGill v. Duckworth, 944 F.2d 344 (7th Cir.1991), *abrogated on other grounds by* Farmer v. Brennan, 511 U.S. 825 (1994)). Specifically regarding the incident in which Mr. Chandler was attacked, he says that he notified detectives about the hit before it happened, but he can't confirm or deny whether he notified Director Oakley. He argues the court can infer Sheriff Buncich knew of the attack before it occurred because this was a serious matter in a facility that he oversaw. An inference of knowledge, however, isn't the type of notice an official must have in order to deliberately not take steps to protect an inmate from a known danger or to make a decision that harms the inmate. *See* Butera v. Cottey, 285 F.3d 601, 607 (7th Cir. 2002) ("even if [the inmate] could show that the correctional officers knew about a risk of harm to [him], this is not enough, without more, to impute knowledge to the Sheriff.").

Finally, Mr. Chandler argues the defendants' policies and inmate rules don't reference prompt medical treatment. His treatment, he claims, was refused for almost two hours. The intentional denial or delay of access to medical care is a violation of the Eighth Amendment's proscription on the

infliction of cruel and unusual punishment. <u>Zentmyer v. Kendall Cnty., Ill.</u>, 220 F.3d 805, 810 (7th Cir. 2000). Again, the Sheriff defendants simply argue Mr. Chandler hasn't pointed to any evidence to support his claim. To survive summary judgment, Mr. Chandler must present or identify evidence demonstrating the existence of an official policy, widespread custom, or deliberate act of the Sheriff or a decisionmaker for the Sheriff defendants that caused his constitutional violation. <u>King v. Kramer</u>, 680 F.3d 1013, 1020 (7th Cir. 2012). Mr. Chandler says the Sheriff defendants don't have a policy regarding adequate medical care, he doesn't point to any custom to delay or deny medical treatment, and he doesn't allege the Sheriff knew of his medical situation and deliberately delayed the time it took Work Release employees to transport him to the hospital. The only evidence he presents is a two hour delay in his treatment. This isn't enough to hold a municipality liable.

The Sheriff defendants assert that Mr. Chandler didn't point to any evidence to support his claims, and at the summary judgment stage they have no greater burden than to point out the deficiencies of his claims. Mr. Chandler relies on the absence of specific policy points and his testimony regarding his experiences at the Work Release facility. Ultimately, however, the evidence Mr. Chandler relies on doesn't show that any official policy, widespread custom, or deliberate act by a decisionmaker caused his alleged constitutional injuries. This is an essential element of his § 1983 claim against the Sheriff defendants and a point on which he will bear the burden of proof at trial. *See* <u>Celotex Corp.</u>

v. Catrett, 477 U.S. 317, 322-323 (1986). Summary judgment is proper for the Sheriff defendants on the policy claims.

## D. Policy of Failure to Train

Mr. Chandler contends the Sheriff defendants failed to properly train, supervise, oversee, or control employees to prevent the sexual abuse of inmates, concerning threats of violence and actual violence against inmates, and regarding adequate medical treatment. A failure to train is characterized as a municipal policy under § 1983 only if it amounts to deliberate indifference to the constitutional rights of persons with whom the municipal entity's employees come into contact. Robles v. City of Fort Wayne, 113 F.3d 732, 735 (7th Cir. 1997) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 390 (1989)). This standard is met when a municipality fails to act when faced with "actual or constructive notice" that the lack of training is likely to result in constitutional deprivations. Id. For example, if a municipality doesn't "train its employees 'with respect to a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face'" or doesn't "provide further training after learning of a pattern of constitutional violations involving the exercise of police discretion." Id.

Mr. Chandler argues that proof of a single incident of unconstitutional activity can impose liability under Monell if the incident was caused by an existing unconstitutional policy. He concludes the policy therefore doesn't have to be widespread. This conclusion omits a key part of the holding from City of

Oklahoma City v. Tuttle, 471 U.S. 808 (1985). The court held that proof of a single incident of unconstitutional activity can impose liability under Monell, if "proof of the incident *includes* proof that it was caused by an existing, unconstitutional municipal policy." Id. at 823-824 (emphasis added). "Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved." Id. at 824. If the policy is constitutional, more proof than a single incident is necessary to establish the municipal entity's fault and the causal link between the policy and the deprivation. Id.

The Sheriff defendants argue Mr. Chandler doesn't point to any evidence of a lack of training. First, regarding training to prevent sexual abuse, in his affidavit, Sheriff Buncich asserts that all Lake County Work Release officers received extensive training in the safe management of inmates. In their statements, Work Release employees Cpl. McQuillin, Lt. Sarkey, and Sgt. Brugos discussed the Work Release inmate search policy. The general policy, as summarized by Sgt. Brugos, was for inmates to be patted down on the outside of their clothing upon entering the facility and for strip searches to be conducted by two officers and with no touching. Lt. Sarkey stated that he "was shown what was proper and improper in searching techniques by my sergeant and corporal when I came on." When asked if he had advised Officer Koleff of the strip search policy, Sgt. Brugos stated that Officer Koleff had "been with us when we've strip searched inmates. He has been with many other officers when strip searches have been performed. We will do our normal pat downs but

when strip searches take place, we stand back." The officer statements show a consistent understanding of the search policy and consequently training on the matter that Mr. Chandler didn't offer evidence to contradict.

Next, Mr. Chandler claims the defendants didn't train employees regarding inmate-on-inmate violence, how to report it, or how to prevent it. The "No. 7 Work Release Policies and Procedures" document only addresses what happens after an assault has occurred: "If an inmate assaults another inmate, the inmate will be transported to Lake County Jail. The inmate that was assaulted <u>may</u> be placed in room 107 until the shift supervisor and Director/Deputy Director make a determination as to the assaulted inmate's involvement, and what punishment if any is to be handed out." In his affidavit, Sheriff Buncich simply asserts that all Sheriff's Department employees are trained in the safe management of inmates. Mr. Chandler relies on the incident in which he was attacked by another inmate as evidence of a failure to train employees regarding inmate-on-inmate violence. But an incident of inmate-on-inmate violence doesn't inevitably result from an unconstitutional policy of a failure to train employees regarding inmate-on-inmate violence, and the policy would have to be proven unconstitutional independently.

Finally, because the defendants' policies and inmate rules don't reference prompt medical treatment, Mr. Chandler claims it can be inferred there is also no training on such matters. As revealed by the inmate search "policy," which seems to be a widespread custom, a written policy isn't required for the

defendants to have trained employees on a topic. Mr. Chandler also relies on his testimony that he was denied medical care for two hours. Evidence of one incident in which medical care wasn't promptly addressed also isn't proof that the delay in care was caused by an unconstitutional policy of failure to train employees regarding the adequate medical care of inmates. Such a policy would have to be separately proved.

The Sheriff defendants argue Mr. Chandler didn't present evidence that they didn't properly train their employees. The court must agree. Other than his testimony regarding his experiences at the Work Release facility, Mr. Chandler didn't present evidence that the Sheriff defendants failed to train their employees on matters that were likely to result in constitutional deprivations. *See* Palmer v. Marion Cnty., 327 F.3d 588, 597 (7th Cir. 2003) ("showing of isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature"). Even when accepting as true all evidence favoring Mr. Chandler and drawing all reasonable inferences from the evidence for him, a reasonable jury couldn't find in Mr. Chandler's favor on the failure to train claims.

### E. Individual Liability

Mr. Chandler's claims against Sheriff Buncich and Director Oakley in their individual capacities fall into two categories. First, the officials failed to enact policies or properly train employees, and this failure led to his

constitutional deprivations. Second, the officials were directly responsible for the incidents in which his constitutional rights were allegedly violated. Section 1983 imposes individual liability on an official who, acting under the color of law, causes the deprivation of a person's right secured by federal law. Kentucky v. Graham, 473 U.S. 159, 166 (1985). For the individual to have caused the constitutional deprivation, the official must have been "personally involved or acquiesced in the alleged constitutional violation." Kelly v. Mun. Courts of Marion Cnty., Ind., 97 F.3d 902, 909 (7th Cir. 1996).

Mr. Chandler claims sexual abuse and inmate-on-inmate violence are common problems and rampant in correctional facilities. As a result, he argues, Sheriff Buncich and Director Oakley had to be aware of these risks, and yet they didn't implement written policies regarding searching inmates, sexual abuse of inmates, or inmate-on-inmate violence. He asserts that an official can be liable in his individual capacity if he participated in any capacity in creating the policy or custom that led to the deprivation. This conclusion goes too far. Direct participation isn't required to show the official was personally involved, but "there must at least be a showing that the [official] acquiesced in some demonstrable way in the alleged constitutional violation." Palmer v. Marion Cnty., 327 F.3d 588, 594 (7th Cir. 2003). Sheriff Buncich contends there is no evidence that such problems were "running rampant" at the Work Release facility in 2011. So, the officials couldn't have been aware of a problem that didn't exist at the facility. Moreover, Mr. Chandler doesn't tell

the court how the failure to enact policies is a constitutional violation in and of itself, and officials can be liable in an individual capacity only if they were personally involved in a constitutional violation. *See* <u>Zimmerman v. Tribble</u>, 226 F.3d 568, 574 (7th Cir. 2000) (Plaintiff alleged that officials oversaw others and established wrongful policies, but didn't allege the officials were personally involved in the constitutional wrongdoing; dismissal appropriate). Sheriff Buncich and Director Oakley also aren't liable in their individual capacities for a failure to train their employees properly because their exercise of supervisory authority, or lack thereof, over employees who allegedly violated Mr. Chandler's constitutional rights isn't the equivalent of participation in the deprivation. <u>Kelly v. Mun. Courts of Marion Cnty., Ind.</u>, 97 F.3d 902, 909 (7th Cir. 1996); <u>Zimmerman v. Tribble</u>, 226 F.3d 568, 574 (7th Cir. 2000).

Mr. Chandler alleges that his constitutional rights were violated in three ways: when he was sexually abused, when he was physically attacked by another inmate, and when he was deprived adequate medical care. He argues Sheriff Buncich and Director Oakley were involved in these incidents. Sheriff Buncich and Director Oakley must have been personally involved or acquiesced in the alleged constitutional violations to be liable in their individual capacities under § 1983. <u>Kelly v. Mun. Courts of Marion Cnty., Ind.</u>, 97 F.3d at 909. Sheriff Buncich claims, however, that he couldn't have been involved in the incidents because he didn't know Mr. Chandler was an inmate at the Work Release facility until October 2011 when Mr. Chandler filed his notice of the

tort claim. Mr. Chandler challenges this assertion and notes the Sheriff signed Officer Koleff's termination letter dated May 27, 2011 that referenced the officer's "conduct unbecoming of an employee of the Department, failure to treat an inmate civilly and courteously, and failure to fully cooperate with an investigation." The letter has what appears to be a handwritten signature of Sheriff Buncich. Construing the evidence in the nonmovant's favor, the court must agree that Sheriff Buncich knew about the sexual abuse allegations well before October 2011, but this evidence doesn't establish the Sheriff learned of the allegations at a time that he could be personally involved in the sexual abuse.

For this, Mr. Chandler contends the court can infer Sheriff Buncich was aware of Mr. Chandler's allegation regarding sexual abuse through the knowledge of the Indiana State Police, Director Oakley, and the warden. To begin with, Mr. Chandler doesn't explain how Sheriff Buncich would have the same knowledge as the Indiana State Police beyond Sgt. Bailey's report to Director Oakley. No inference is needed for the court to conclude that Director Oakley, not Sheriff Buncich, received information from the Indiana State Police; his own report outlines the information received. One can reasonably infer that Sheriff Buncich learned of the sexual abuse and the subsequent investigation because he was involved in the accused officer's termination. This inference, however, doesn't produce a link between the Sheriff's knowledge and his personal involvement or acquiescence in the alleged constitutional violation –

the sexual abuse. That particular inference can't be drawn without evidence that the knowledge was passed along before the sexual abuse occurred. Mr. Chandler points to no such evidence.

Further, no evidence in the record shows, or allows an inference that, Sheriff Buncich was informed about the threat of violence to Mr. Chandler, the physical attack, or the resulting medical care until he received the tort notice. No evidence in the record shows the Sheriff is informed of all threats of violence and physical attacks within the facilities that he oversees or the resulting medical care. Arguably, the official in charge of the facility should be informed of such important matters, but that still doesn't establish that Sheriff Buncich knew about the matters before they occurred. Again, the Sheriff would need to know about the threat of violence, the physical attack, and the medical treatment before they happened to be personally involved or acquiesce in their occurrence. The mere relationship between Director Oakley and the warden and their supervisor, Sheriff Buncich, doesn't support a reasonable inference, as Mr. Chandler urges, that the Sheriff shared their knowledge.

Director Oakley also asserts no evidence supports Mr. Chandler's claims that he was personally involved in the alleged constitutional violations. First, Director Oakley claims there isn't any evidence that Mr. Chandler was abused after Director Oakley learned of the alleged abuse on April 17. Mr. Chandler claims Director Oakley knew about the allegation of abuse and should have taken action to prevent it from happening again. The record reflects that Mr.

Chandler reported the abuse to Sgt. Bailey at the Indiana State Police on April 14. Sgt. Bailey found no grounds for a sexual assault charge but notified Director Oakley, on April 17, that Mr. Chandler had reported a sexual assault by Officer Koleff. Sgt. Bailey told Mr. Chandler to tell Work Release staff about the incident. Mr. Chandler reported to the Work Release facility on April 22, and Officer Koleff searched him. Mr. Chandler's deposition testimony doesn't clearly reflect whether the sexual abuse occurred on the 22nd. Mr. Chandler reported the abuse to Work Release employees on the 23rd, and Cpl. McQuillin prohibited Officer Koleff from having any contact with the weekend inmates and required that he have another officer with him at all times. A Work Release employee and Mr. Chandler notified Director Oakley of Mr. Chandler's allegations on Monday, April 25. After speaking with Mr. Chandler on the 25th, Director Oakley met with him about the allegation the next day, and the first recorded statement in the internal investigation was taken on April 27. Construing the facts in Mr. Chandler's favor, the court must assume that Mr. Chandler was abused on the 22nd, after the Indiana State Police informed Director Oakley of the accusation, but before Mr. Chandler reported the abuse to a Work Release employee. The question thus becomes whether Director Oakley's failure to act on the information he received from Sgt. Bailey violated Mr. Chandler's constitutional rights.

At this point, the court steps back to an element it hasn't yet needed to reach, the alleged constitutional violation. Mr. Chandler alleges he was touched

inappropriately by an officer during a strip search and this happened again after Director Oakley knew about the allegation. Deliberate indifference to inmate safety is the recognized standard of protection afforded to convicted prisoners under the Eighth Amendment. <u>Palmer v. Marion Cnty.</u>, 327 F.3d 588, 593 (7th Cir. 2003). To establish deliberate indifference for a failure to protect from harm, the plaintiff must show (1) that he was incarcerated under conditions posing a "substantial risk of serious harm," and (2) that the defendants knew of and disregarded the risk to his safety. <u>Id.</u> (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 834, 837 (1994)). Mr. Chandler must demonstrate that Director Oakley had "actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from [his] failure to prevent it." <u>Lewis v. Richards</u>, 107 F.3d 549, 553 (7th Cir. 1997). Director Oakley's notes regarding the call from Sgt. Bailey of the Indiana State Police reflect the only evidence of what he learned of the impending harm to Mr. Chandler. In those notes, Director Oakley identifies the inmate, Mr. Chandler, and the accused guard, Officer Koleff. He notes that Mr. Chandler claimed he had been sexually assaulted by the officer at the Work Release facility, Sgt. Bailey concluded that what Mr. Chandler reported wasn't grounds for a sexual assault charge, and the case was closed. Sgt. Bailey had told Mr. Chandler to inform the staff or warden about the incident. Director Oakley didn't know what occurred or when it occurred. He only knew something happened at the facility that Mr. Chandler claimed was a sexual

assault, the State Police had concluded that it didn't constitute a crime, and Mr. Chandler was told to inform the staff. "Eighth Amendment liability requires consciousness of a risk," Farmer v. Brennan, 511 U.S. 825, 840 (1994), but Director Oakley didn't learn enough from his conversation with Sgt. Bailey to consciously disregard the risk of sexual assault that confronted Mr. Chandler upon entering the facility and being searched by Officer Koleff. Without knowledge of the specific risk of harm to Mr. Chandler, Director Oakley couldn't disregard the risk, Farmer v. Brennan, 511 U.S. at 842 ("it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm"), or condone the abuse by allowing it to happen, Santiago v. Walls, 599 F.3d 749, 756 (7th Cir. 2010), and therefore Director Oakley didn't violate Mr. Chandler's Eighth Amendment rights.

Next, Director Oakley says there is no evidence Mr. Chandler notified him or any other Work Release employee of a potential threat of violence before it occurred and no evidence Mr. Chandler's medical care wasn't proper. Mr. Chandler argues the director should have been concerned about retaliation after Mr. Chandler accused a guard of inappropriate behavior and Director Oakley was aware of the threat of violence but did nothing. He doesn't address Director Oakley's involvement in his medical care. In his deposition, Mr. Chandler said he can't confirm or deny whether he informed Director Oakley about the hit before it happened, and the record reflects no evidence that Director Oakley was informed of Mr. Chandler's need for medical attention or

the medical treatment that he received. The court must construe the evidence in Mr. Chandler's favor, but the court can't construe his ambiguous answer to whether he directly notified Director Oakley of the threat to mean that he did so. The summary judgment record contains nothing to support a finding that Director Oakley knew about the impending attack or the medical treatment that followed, so he couldn't be found to have been personally involved or acquiesced in the alleged constitutional violations that resulted.

Finally, regarding the ordered hit, Mr. Chandler argues that since "everyone knew" of the pending attack, Sheriff Buncich and Director Oakley should also have known. In the Lake County Police Detective Bureau investigation summary report regarding the attack, the investigator asked inmate Jaquan Richards, "Did you know that anything was going to happen to Brian [p]rior to the incident?" Mr. Richards answered, "Yah, everybody was talking about it." This statement supports the proposition that the pending attack was known among the inmates, but it doesn't support a conclusion that Work Release employees, their boss, or their boss's boss were also aware of the information and talking about it. The court must draw all inferences in Mr. Chandler's favor, but even the most generous inference only leads the court to the conclusion that the guards might have picked up on the gossip regarding a pending attack, not the Director or Sheriff who are unlikely to have much personal interaction with the inmates. No reasonable trier of fact could infer

either official had actual knowledge of the threat of violence from the testimony of one inmate that "everybody was talking about it."

Sheriff Buncich and Director Oakley, in their individual capacities, are entitled to judgment on any claims advanced by Mr. Chandler that they failed to enact policies or train their employees. They also are entitled to judgment on claims that they were personally involved in the incidents that allegedly led to constitutional violations. Because neither Sheriff Buncich nor Director Oakley is liable in their individual capacities, the court needn't reach their argument that they are also entitled to qualified immunity.


V. State Law Claims

At this point, the plaintiff's federal claims brought under 42 U.S.C. § 1983 are resolved, and the court typically relinquishes its supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367; Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp., 551 F.3d 599, 607 (7th Cir. 2008). The court can retain jurisdiction in the interest of "judicial economy, convenience, fairness, and comity." Id. at 608. The facts that are the basis of the state and federal claims are identical, but the court believes the theories of statutory immunity asserted by the defendants are best addressed by the state courts.

## VI. CONCLUSION

For the forgoing reasons, the court GRANTS IN PART and DISMISSES IN PART the defendants' motions for summary judgment (Doc. Nos. 45, 57) as follows: the motions are GRANTED as to all claims brought pursuant to 42 U.S.C. § 1983 and DISMISSED as to the claims brought under state law. The court VACATES the November 21, 2014 final pretrial conference and the jury trial set for December 15, 2014.

SO ORDERED.

ENTERED: November 14, 2014

_____/s/ Robert L. Miller, Jr._____
Judge
United States District Court